## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Theo Smith,

                Plaintiff,

v.

Ghana Commercial Bank, Ltd.,
Attorney General/Government of
Ghana, and John A. Mills,

                Defendants.

Civ. No. 10-4655 (DWF/JJK)

**REPORT AND
RECOMMENDATION**

## INTRODUCTION

This matter is before this Court for a Report and Recommendation on the following motions: (1) Plaintiff's Motion for Entry of Default and Default Judgment (Doc. No. 16); (2) Plaintiff's Motion for Summary Judgment (Doc. No. 32); and (3) Defendants' Joint Motion to Dismiss the Complaint (Doc. No. 41). *See* 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons that follow, this Court recommends that Defendants' motion be granted in part and denied in part, that Plaintiff's motions be denied, that this case be dismissed without prejudice, and that Plaintiff be enjoined from filing certain future lawsuits.

## BACKGROUND

**The Complaint**

The *pro se* Complaint sets forth a jumble of allegations that, as best this Court can decipher,[1] revolve around Plaintiff's claim that he lost many millions of dollars in some shady business dealings in the country of Ghana.   The starting point in Plaintiff's story is in September 1999, when either money or an undefined "consignment" belonging to Plaintiff, or both, accumulated from the sale of gems and precious metals, arrived in Ghana.  (*See* Doc. No. 1, Compl.  ¶ 19.)  Plaintiff inspected the money/consignment and brought a sample back to the United States to have it examined by the United States Secret Service, which determined that the sample was genuine.  (*Id.* ¶¶ 20–21.)

In April 2001, Plaintiff contacted a "certified zonal agent" named "Tony" to complete paperwork for the requisition of equipment and supplies to process $18 million worth of "designer-faced defaced currency," presumably the money/consignment described before.  (*Id.* ¶ 22.)  Plaintiff asserts that he paid

---

[1]     Although this Court gives some leeway to a *pro se* Plaintiff's compliance with the requirement that a Complaint set forth a short and plain statement of facts, *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976),  there are limits to this Court's tolerance that are certainly tested by this Complaint.  Among those limits is the fact that this Court cannot create claims or make up allegations that are found nowhere in the Complaint.  *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (noting that district courts do not assume facts that are not alleged when giving a *pro se* complaint a liberal construction).  Despite this Court's difficulty in trying to sort out just what Plaintiff is alleging in the Complaint, it is clear, from even a liberal construction of the Complaint, that the case should be dismissed for lack of jurisdiction.

$75,000 to Tony for this processing and requisition.  (*Id.*)  Plaintiff then established some related form of registration with, as this Court interprets the Complaint, Defendant Ghana Commercial Bank (GCB).  (*Id.* ¶ 23.)  Plaintiff transferred the assets to Tony (*id.* ¶ 26), under the supervision of Plaintiff's own security agent (*id.* ¶ 27), at which point Tony used force to seize the consignment and attempted to extort Plaintiff.  (*Id.* ¶ 28.)  Apparently there was only one copy of the document certifying title to the consignment, and Tony took possession of it.  (Compl. ¶ 29.)  Though not stated in the Complaint, it seems this lack of title led to the bank denying Plaintiff access to his assets.

In August 2001, someone named "Mr. Robert, who has a principal-agent relationship with Defendants, the same as Tony,"[2] contacted Plaintiff and "asked if [he] had encountered a problem with his currency assets."  (*Id.* ¶ 31.)  Plaintiff explained to Mr. Robert that Tony had seized the consignment (*id.* ¶ 33), and Mr. Robert arranged to have Tony bring the consignment to Mr. Robert's office, where Plaintiff inspected the consignment.  (*Id.* ¶¶ 34, 36.)  Mr. Robert signed a paper granting "him," (it is unclear whether "him" refers to Plaintiff or Mr. Robert), custody over the consignment (*id.* ¶ 38), and Mr. Robert then delivered the consignment to GCB's vault.  (*Id.* ¶ 39.)

---

[2]     This Court assumes that the relation Plaintiff is referring to is some relationship "Mr. Robert" and "Tony" had to either Ghana Commercial Bank or the Government of Ghana, or both.

In July 2002, Plaintiff met with Mr. Robert and Dr. Williams, "a highly placed manager at Ghana Commercial Bank," regarding release of the funds, but to no avail.  (Compl. ¶¶ 43–45.)  Then in July 2003, "Plaintiff received communication from Royal Crown Securities and Deposits (Royal Crown), an account facility for holding funds, along with a bank deposit receipt."  (*Id.* ¶ 50.) The receipt showed $54 million registered with "the bank," including Plaintiff's $18 million.  (*Id.* ¶ 51.)  Plaintiff then made several visits to GCB in an attempt to obtain release of the funds, and was told "action needed to be taken" or was "contacted by a bank official."  (*Id.* ¶¶ 53–55.)  No funds were ever released.

From July 2003 through October 2004, Plaintiff engaged in a campaign to investigate the situation with the help of Ghanaian officials and groups involving then President John Kufuor, the Attorney General of Ghana, the Ghana Anti-Corruption Coalition, the Chief Director of the Police, and the Bureau of National Investigation.  (Compl. ¶¶ 68–80.)  Plaintiff was told that his "case is not winnable" and that there was "'no need to take action.'"  (*Id.* ¶ 76.)

Elsewhere in the Complaint, Plaintiff discusses June 2009 Declarations made in connection with a very similar action he brought before this Court in 2008.[3]  One such declaration made by the "General Manager of the Legal Services Division of [GCB]" confirms that an account matching the number on

---

[3]    *Smith v. Ghana Commercial Bank, Ltd.*, Civ. No. 08-5324 (ADM/JJK), Doc. No. 1 (D. Minn. filed Oct. 1, 2008).

Plaintiff's receipt exists and that it contains "a small amount of money," but denies that Royal Crown is the name on the account and disputes that any misconduct took place. (Compl. ¶¶ 60–62.) The other is from Ghana's Solicitor General, and denies expropriating Plaintiff's assets. (*Id.* ¶ 82.)

The Complaint also discussed how, in 2001, Plaintiff wired over $20,000 to Goldwin Kwami Ahiakpopt's account with the GCB. (*Id.* ¶¶ 64–65.) What this has to do with the primary allegations in the case remains a mystery. The facts alleged by Plaintiff end abruptly at this point. Plaintiff seeks judgment in the amount of $18 million, accumulated interest, statutory treble damages, and court costs and reasonable legal fees. (*Id.* at 14.)

**Procedural History**

Plaintiff filed his Complaint on November 18, 2010.[4] (Doc. No. 1.) On January 17, 2012, after filing a Certificate of Service (Doc. No. 14), Plaintiff moved for entry of default and default judgment. (Doc. No. 16.) Plaintiff's motion for entry of default and default judgment lists John A. Mills as the only Defendant against whom judgment is currently sought. About two months later, Plaintiff moved for summary judgment. (Doc. No. 32.) And on April 2, 2012, Defendants filed their Motion to Dismiss. (Doc. No. 41.)

---

[4]     Plaintiff has filed two prior lawsuits against these same Defendants making substantially similar allegations to those raised in the current Complaint. *See Smith v. Ghana Commercial Bank*, Civ. No. 07-1447 (DWF/AJB) (D. Minn. filed Mar. 7, 2007); *Smith*, Civ. No 08-5324. Each was dismissed without prejudice; the first on June 11, 2008, for lack of personal jurisdiction, and the second on October 13, 2009, for failure to properly serve the defendants.

## DISCUSSION

## I.   DEFENDANTS' MOTION TO DISMISS

Plaintiff's Complaint and Defendants' Motion to Dismiss raise issues that

concern the Court's jurisdiction over the subject matter of this lawsuit.  Before

addressing the merits of the lawsuit, which Defendants also challenge in their

Motion to Dismiss and which Plaintiff claims have been established in his favor

through his Motion for Summary Judgment, this Court must first determine

whether it has the authority to adjudicate the merits at all.  "Subject matter

jurisdiction . . . is a threshold requirement which must be assured in every federal

case."  *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991).

### A.   Lack of Subject-Matter Jurisdiction

### 1.   Legal Standard

Defendants first argue that this Court lacks subject-matter jurisdiction

under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, *et seq.*,

and the common law of foreign sovereign immunity.  (Doc. No. 43, Defs.' Mem. in

Supp. of Mot. to Dismiss Pl.'s Compl. ("Defs.' Mem.") 5–12.)   Immunity is a

matter of subject-matter jurisdiction.  *See*, *e.g.*, *Hagen v. Sisseton-Wahpeton*

*Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000).  Motions to dismiss for lack of

subject matter jurisdiction are governed by Rule 12(b)(1) of the Federal Rules of

Civil Procedure.  A plaintiff bears the burden of establishing the court's "subject

matter jurisdiction in his complaint by making a short, plain statement of the

grounds for the court's subject matter jurisdiction."  *Khattak v. Dep't of Homeland*

*Sec.*, Civ. No. 06-1738 (JMR/FLN), 2007 WL 1080383, at *2 (D. Minn. Apr. 9, 2007).

Challenges to subject-matter jurisdiction can take one of two forms: (1) a "facial attack"; or (2) a "factual attack." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). On a motion raising a facial challenge to the court's jurisdiction, the court views the pleadings in the light most favorable to the non-moving party and treats the alleged facts as true. *Ossman v. Diana Corp.*, 825 F. Supp. 870, 879–80 (D. Minn. 1993). Dismissal is proper on a facial attack where the complaint fails to adequately allege any basis for subject-matter jurisdiction. *Osborn*, 918 F.2d at 729 n.6. But where a defendant raises a factual challenge concerning jurisdiction, the court need not accept the plaintiff's allegations relating to jurisdiction as true, and the court can evaluate the merits of jurisdictional claims. *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The trial court considering a factual challenge may make "'any rational mode of inquiry'" to determine jurisdictional facts. *Id.* (quoting *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986)). "When a plaintiff's 'allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof,' '[a]nd . . . for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence.'" *Semler v. Klang*, 603 F. Supp. 2d 1211, 1220 (D. Minn. 2009) (quoting *Zunamon v. Brown*,

418 F.2d 883, 886 (8th Cir. 1969) (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936))).

Here, as clarified at the hearing by Defendants' counsel, Defendants have raised a factual challenge.  Defendants have appropriately submitted affidavits and exhibits relating to the jurisdictional inquiry, *see Osborn*, 918 F.2d at 730 ("The motion may be supported with affidavits or other documents"), and Plaintiff had an opportunity to respond to the jurisdictional challenge.  Therefore, where necessary to determine whether this Court has subject-matter jurisdiction, this Court will consider matters outside the pleadings.

### 2.   The Republic of Ghana is Immune from Suit under the Foreign Sovereign Immunities Act

Federal courts only have jurisdiction to hear claims against foreign sovereigns in limited circumstances.  "[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Cmty. Fin. Group, Inc. v. Republic of Kenya*, 663 F.3d 977, 980 (8th Cir. 2011) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989), and citing 28 U.S.C. §§ 1330(a), 1604).  Under the FSIA, a foreign state is "presumptively immune" from federal court jurisdiction "unless a specified exception applies."  *Id.* (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).  This immunity from suit applies to the foreign state itself, its political subdivisions, and to agencies or instrumentalities of the foreign state.  *Id.* (citing 28 U.S.C. § 1603(a)).  "Once a foreign state makes a prima facie showing of

immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies."  *Id.* (quoting *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1382 (8th Cir.1993)).  For example, a foreign state is not immune from suit in cases where the foreign state waives its immunity either explicitly or implicitly.  28 U.S.C. § 1605(a)(1).  Nor is the foreign state immune where the action concerns commercial activity carried out in the United States, or where an action taken outside the United States in connection with the foreign state's commercial activity causes a direct effect in the United States.  *Id.* § 1605(a)(2).[5]

To the extent Plaintiff has named the Republic of Ghana as a Defendant in this matter,[6] this Court lacks subject-matter jurisdiction concerning any claims Plaintiff asserts against it.  Ghana is plainly a "foreign state" for purposes of the FSIA, 28 U.S.C. § 1603(a), and, thus, Plaintiff bears the burden of showing that an exception to Ghana's immunity from suit applies.  Plaintiff has failed to meet that burden.

Ghana has not waived its immunity in this suit.  Rather, it has challenged jurisdiction on immunity grounds from its first appearance in the case.  Plaintiff

[5]     The FSIA includes several other exceptions as well.  *See* § 1605(a)(3)–(6). However, these exceptions are not raised by Plaintiff's allegations in this matter, and, therefore, this Court does not discuss them.

[6]     In the Complaint, Plaintiff names "Ghana Attorney General/Government of Ghana" as a Defendant.  (Compl. at 1.)  Out of caution, the Defendants have filed their motion to dismiss on behalf of both Ghana's Attorney General and the Republic of Ghana.  (*See* Defs.' Mem. 5.)

has also failed to show that Ghana engaged in any commercial activity in the United States.  Nor does he demonstrate that Ghana engaged in commercial activity outside the United States that had a direct impact within it.  Although Plaintiff appears to allege some wrongdoing by Ghana's law enforcement authorities failing to apprehend those who allegedly separated him from his funds (Compl. ¶¶ 67–81), the commercial-activity exception applies where "a foreign state acts 'not as regulator of a market, but in the manner of a private player within it.'"  *Cmty. Fin. Group, Inc.*, 663 F.3d at 980 (quoting *Gen. Elec. Capital Corp.*, 991 F.2d at 1382 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992))).  Here, Plaintiff merely alleges that Ghana failed to properly investigate and prosecute private individuals he claims defrauded him.  "[D]ecisions regarding whether or how to investigate an allegedly fraudulent commercial transaction between private parties . . . are governmental rather than commercial activities."  *Id.*  Accordingly, Ghana is entitled to sovereign immunity and the Complaint should be dismissed against it for lack of subject-matter jurisdiction.

### 3.    Common Law Immunities

The applicability of the FSIA's immunity provisions to this case ends with the dismissal of the Republic of Ghana from this suit.  Defendants do not contend

that Ghana's President, John A. Mills, the Attorney General of Ghana, or GCB[7] are entitled to immunity from suit under the FSIA.  (*See* Defs.' Mem. 8.)  Instead, Defendants acknowledge that under the United States Supreme Court's decision in *Samantar v. Yousuf*, 130 S. Ct. 2278 (2010), the FSIA does not protect officials of foreign governments from suit.  *Id.* at 2292–93.

In *Samantar*, several native Somalis brought a suit under the Torture Victim Protection Act and the Alien Tort Statute to hold the former First Vice President and Minister of Defense of Somalia, Mohamed Ali Samantar, personally liable for the torture and extrajudicial killing of the plaintiffs' family members.  *Id.* at 2282.  The issue before the Supreme Court was whether the FSIA provided Samantar with immunity from suit "based on actions taken in his official capacity" while he had been a Somali government official.  *Id.*  Based on the FSIA's "text, purpose, and history" the Court concluded that an official such as Samantar was not entitled to immunity under the FSIA.  *Id.* at 2292.  But in reaching that conclusion, the Court explained that "[e]ven if a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law[.]"  *Id.*  Taking their cue from *Samantar's* recognition that individual

---

[7]     Defendants acknowledge that GCB and the Republic of Ghana are separate and distinct entities and that Ghana merely owns some shares in GCB. Defendants do not contend that the FSIA's protection from suit for "foreign states" and their "agencies" and "instrumentalities" applies to GCB. (Defs.' Mem. 7.)  This Court addresses Defendants other immunity-based arguments concerning GCB later in this Report and Recommendation.  *See* discussion, *infra*, Part I.A.4.

foreign officials retain certain immunity defenses under common law, Defendants argue that this Court has no jurisdiction to hear Plaintiff's claims against President Mills and the Attorney General of Ghana.  (Defs.' Mem. 8–10.)

The common law has a long history of recognizing the immunity from suit for foreign sovereigns and foreign officials.  Chief Justice Marshall's opinion in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), provides the foundation of foreign sovereign immunity law in the United States.  *See Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 268 (S.D.N.Y. 2001) (recognizing that *The Schooner Exchange* is the bedrock for the law of foreign sovereign immunity in the United States),[8] *aff'd in part, rev'd in part on other grounds, and remanded in Tachiona v. U.S.*, 386 F.3d 205 (2d Cir. 2004).  These founding principles can be summarized as follows:

- the jurisdiction of each nation's courts within its own territory is "'exclusive and absolute,' and subject to 'no limitation not imposed by itself,'" *Tachiona*, 169 F. Supp. 2d at 268 (quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) at 136);

- each nation is incapable of conferring extraterritorial power on its courts, a proposition that flows from the comity and reciprocity each sovereign state shows to other states, *id.* at 268–69;

- the consent of a foreign sovereign is needed to support the exercise of another sovereign's jurisdiction within its territories, *id.* at 269; and

_____

[8]     United States District Judge Victor Marrero of the Southern District of New York's opinion in *Tachiona* contains a thorough discussion of the historical development of foreign sovereign immunity law in the United States, particularly the immunity provided to a foreign sovereign's head of state.  169 F. Supp. 2d at 268–78.

- certain limitations may be placed on the sovereign immunity enjoyed by a foreign official for acts where that official "'assum[es] the character of a private individual,'" *id.* (quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) at 145).

These principles endured for many years following the Supreme Court's decision in *The Schooner Exchange* and developed into a so-called "absolute" theory of foreign sovereign immunity. "Until 1952, the State Department ordinarily requested immunity in *all actions* against friendly foreign sovereigns," and courts honored such requests. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983) (emphasis added). But in 1952, following "increases in international commerce and changes in state economic systems that occurred after World War II," *Tachiona*, 169 F. Supp. 2d at 270, the absolute theory was abandoned in favor of a "restrictive" view, in which the State Department would recognize immunity only for certain causes of action involving a foreign state's public or governmental actions. Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Phillip B. Perlman (May 19, 1952), reprinted in 26 Dep't of State Bull. 984–85 (1952).

However, application of the restrictive theory "proved troublesome" in the years after 1952, and political influence seeped into the State Department's practice of filing "suggestions of immunity" in cases "where immunity would not have been available under the restrictive theory." *Verlinden*, 461 U.S. at 487. This led to different outcomes being reached by the Executive Branch in similar situations, and courts were "left without objective rules of law to apply in cases

where the foreign state did not request immunity." *Tachiona*, 169 F. Supp. 2d at

272. Against the backdrop of these concerns about consistent enforcement of

foreign sovereign immunity law, Congress enacted the FSIA in 1976, and

granted immunity to **foreign states**, as well as their instrumentalities and

agencies, except in limited circumstances.

But in addressing those concerns through the FSIA, Congress was silent on

the immunity from suit, if any, enjoyed by **foreign officials**. *Samantar*, 130 S.

Ct. at 2292; *Tachiona*, 169 F. Supp. 2d at 275 (observing that the FSIA does not

answer questions whether or to what extent individual officials of a foreign

sovereign are entitled to immunity from suit). Despite that congressional silence,

foreign officials may still invoke the common law to claim immunity from suit. In

*Samantar*, the Court explained that "[d]iplomatic and consular officers could . . .

claim the 'specialized immunities' accorded those officials . . . and officials

qualifying as the 'head of state' could claim immunity on that basis[.]" 130 S. Ct.

at 2285 n.6. Further, the Court observed that it "may be correct as a matter of

common-law principles" that "foreign sovereign immunity extends to an individual

official 'for acts committed in his official capacity.'" *Id.* at 2291 n.17. This

immunity applies to suits where the allegations against the official named as a

defendant demonstrate that the "state is the real party in interest." *See id.* at

2292 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

As they did during the years after the Supreme Court's decision in

*The Schooner Exchange*, courts assessing these common-law claims of foreign

sovereign immunity today apply a two-step procedure.  *See*, *e.g.*, *Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247, 249 (D.D.C. 2011) ("According to the common law of foreign official immunity, immunity is determined through a 'two-step procedure.'" (quoting *Samantar*, 130 S. Ct. at 2284)).  Under this two-step approach "the diplomatic representative of the sovereign could request a 'suggestion of immunity' from the State Department."  *Samantar*, 130 S. Ct. at 2284.  If the State Department granted that request, "the district court surrendered its jurisdiction."  *Id.*  But if the State Department did not grant the request or provided no response at all, "a district court had authority to decide for itself whether all the requisites for such immunity existed."  *Id.*  When deciding for itself, "a district court inquire[s] whether the ground of immunity is one which it is the established policy of the State Department to recognize."  *Id.* at 2284–85.  In other words, courts treat a suggestion of immunity "as a conclusive determination by the political arm of the Government," *Ex Parte Peru*, 318 U.S. 578, 589 (1943), but, if the Executive Branch provides none, courts attempt to discern whether a proper basis for immunity exists.

Here, because the State Department has filed no suggestion of immunity, this Court must address step two of the established procedure.  *See Abiola v. Abubakar*, 267 F. Supp. 2d 907, 915 (N.D. Ill. 2003) ("In the absence of guidance from the Executive Branch, 'courts may decide for themselves whether all the requisites of immunity exist'" (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–35 (1945))).  Two potential common-law immunities are at issue here:

(1) head-of-state immunity for Ghanaian President John A. Mills; and (2) foreign official immunity for Ghana's Attorney General.

> ### a. President Mills is Entitled to Head-of-State Immunity

At least one circuit court has observed that "[t]he scope of [head-of-state] immunity is in an amorphous and undeveloped state," *In re Doe*, 860 F.2d 40, 44 (2d Cir. 1988), and "there is virtually no statutory guidance regarding when such immunity is present," 1 Vad P. Nanda & David K. Pansius, *Litig. of Int'l Disputes in U.S. Courts* § 4:2 (2012).  However, this Court is not entirely without guidance on how to apply this common-law doctrine.  Head-of-state immunity arose out of traditional concepts of the sovereign that equated the ruler of a sovereign state with the state itself.  *See id.* § 4:2 & n.3 (noting that "there was a time when there was no difference between the sovereign state and the head of state" and illustrating this point through  King Louis XIV of France's remark equating the state with the person of the monarch: "'L'etat c'est moi.'"); *Tachiona*, 169 F. Supp. 2d at 264 (attributing the same quote to King Louis XIV).   Chief Justice Marshall's opinion in *The Schooner Exchange* also expresses this conflation of state and ruler.  The decision "refers to the state and the 'prince' as one, and describes the state, anthropomorphically transfigured in the person of the sovereign prince, as 'he' and 'him'."  *Tachiona*, 169 F. Supp. 2d at 269 (quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137, 144).  A rationale for this view was that "[a] ruler could not be seen to 'degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another.'"  *Abiola*,

267 F. Supp. 2d at 911.  This equation of the immunity enjoyed by both the ruler and the state also appears in the Restatement (Second) of Foreign Relations Law of the United States § 66: "The immunity of a foreign state . . . extends to: (a) the state itself; [and] (b) *its head of state . . . .*"  *Id.* § 66(a)–(b).

Today, the conceptual identity of the sovereign state's ruler with the state itself may have waned.  *See* Joseph W. Dellapenna, *et al.*, *Head-of-State Immunity—Foreign Sovereign Immunities Act—Suggestion by the Department of State*, 88 Am. J. Int'l L. 528, 530 (1994) ("With the literal fall of empires in the twentieth century, continuation of the identification of a monarch or other head of state with the state itself was no longer meaningful, and the practice gradually fell into general disuse (except to some extent in British courts, at least when the foreign state is headed by a monarch).").  But "[o]ld ideas die hard."  *Tachiona*, 169 F. Supp. 2d at 265.  For purposes of head-of-state immunity, the absolute immunity enjoyed by a foreign sovereign's principal government officer remains intact.  *See* 1 Vanda & Pansius, *Litig. of Int'l Disputes in U.S. Courts* § 4:2 (noting that it remains largely true that there is no difference between the sovereign state and the head of state for purposes of immunity analysis).  "[F]oreign sovereign immunity and head of state immunity were not conceptually distinct doctrines until the FSIA carved out certain immunity exceptions for foreign states."  *Abiola*, 267 F. Supp. 2d at 916.  In other words, "[a] head of state, like the state itself, can therefore be understood to enjoy any immunity that states retain after the FSIA's enactment."  *Id.*

There is no dispute in this matter that President John A. Mills is the acting head of state of the Republic of Ghana. U.S. Department of State, *Background Note: Ghana, Principal Government Officials*, http://www.state.gov/r/pa/ei/bgn/2860.htm (listing John Atta Mills as Ghana's President); *id.*, *Background Note: Ghana, Government and Political Conditions* ("The president is head of state, head of government, and commander in chief of the armed forces.") (last visited on June 8, 2012); (Doc. No. 44, Decl. of the Republic of Ghana's Solicitor General ("Solicitor General Decl.") ¶ 2). And Plaintiff's specific allegations against President Mills are, at best, unclear.[9] What is clear, however, is that Plaintiff does not suggest that here President Mills laid down his official status and assumed the character of a private individual. *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 145 (suggesting that in these circumstances there may be some limitation on the immunity afforded the ruler of a foreign state). Instead, Plaintiff has conclusively alleged that President Mills deprived Plaintiff of his property rights "in his capacity as the Chief Executive Officer of the government of Ghana." (Compl. ¶¶ 93–96.) Essentially, Plaintiff asserts that President Mills should have done something different, *as the President of Ghana*, to pursue the individuals who allegedly defrauded him.

---

[9]    Plaintiff does claim to have contacted former Ghanaian President John Kufuor regarding investigation, arrest, and prosecution of the individuals he claims defrauded him. (Compl. ¶¶ 68–69.) Former President Kufuor is not named as a defendant in this case.

A lawsuit cannot proceed against the head of state on such an allegation. Comity and each nation's mutual respect for the exclusive and absolute authority within one another's respective territories are the backbone of the common law of foreign sovereign immunity. *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 137 (noting that each sovereign is "in no respect amenable to another"); *id.* at 144 (noting that the "power and dignity" enjoyed by a head of state of one sovereign are necessarily affected by the interference of a foreign state). Plaintiff's lawsuit asks this Court to impose its own authority in contravention of that principle of mutual respect. Were this Court to exercise jurisdiction here and consider the merits of Plaintiff's allegations, it would be directly interfering with President Mills' duty to enforce Ghana's laws as Ghana's principal law-enforcement officer.[10] Under the common law, to prevent that type of interference, a head of state is immune from suit. In addition, under the common law, the head of state of a foreign sovereign enjoys immunity from suit at least to the same extent as the state itself, *Abiola*, 267 F. Supp. 2d at 916, and a foreign state cannot be subject to suit for decisions concerning whether or how to

---

[10]    In the Republic of Ghana, "[e]xecutive authority is established in the Office of the Presidency, together with his Council of State." U.S. Department of State, *Background Note: Ghana, Government and Political Conditions*, http://www.state.gov/r/pa/ei/bgn/2860.htm; The Constitution of the Republic of Ghana, Ch. 8, Art. 58, § (1)–(2) ("The executive authority of Ghana shall vest in the President and shall be exercised in accordance with the provisions of this Constitution. . . . The executive authority of Ghana shall extend to the execution and maintenance of this Constitution and all laws made under or continued in force by this Constitution.").

investigate fraud between private parties.  *Cmty. Fin. Group, Inc.*, 663 F.3d at

980.  Accordingly, this Court concludes that President Mills is immune from suit

and recommends that Plaintiff's lawsuit be dismissed against President Mills.

### b.     Ghana's Attorney General is Entitled to Foreign Official Immunity

Defendants also argue that Ghana's Attorney General is entitled to

immunity because any allegations directed at the Attorney General concern acts

committed in his official capacity.[11]  Authority examining whether, and to what

extent, foreign officials are entitled to immunity under the common law is sparse.

Most of the cases that have involved officials other than heads of state concern

diplomatic or consular officials.  However, in *Samantar*, the Supreme Court

observed that "[a]lthough cases involving individual foreign officials as

defendants were rare, the same two-step procedure was typically followed when

a foreign official asserted immunity."  130 S. Ct. at 2284–85.  In support of this

observation, the Court cited *Waltier v. Thomson*, 180 F. Supp. 319, 320–21

---

[11]     Defendants refer to the "acts of state" doctrine to support this position. Under that doctrine, "an official's acts can be considered the acts of the foreign state, and . . . 'the courts of one country will not sit in judgment' of those acts when done within the territory of the foreign state."  *Samantar*, 130 S. Ct. at 2290 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).  This doctrine, however, "is distinct from immunity, and instead 'provides foreign states with a substantive defense on the merits.'"  *Id.* (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004)).  As explained more fully in this section, because this Court concludes that the Ghana Attorney General is immune from suit as a Ghanaian official, it does not reach the "acts of state" doctrine; the immunity afforded Ghana's Attorney General resolves all claims against him on jurisdictional grounds, not on the merits.

(S.D.N.Y 1960), and *Heaney v. Gov't of Spain*, 445 F.2d 501, 504–05 (2d Cir. 1971), both of which relied on the immunity afforded a consular official.

The Second Circuit's decision in *Heaney* suggested a potentially broader application of immunity when a litigant sues a foreign official (other than a consular official) over the exercise of his or her official duties.  445 F.2d at 504.  Relying on the Restatement (Second) of Foreign Relations Law of the United States § 66(f) (hereinafter "Restatement"), the court noted that the case against the defendant foreign official could be dismissed simply because the plaintiff had alleged that the defendant was acting as "an employee and agent of the defendant Spanish Government" at all relevant times.  *Heaney*, 445 F.2d at 504.  This is supported by the Restatement, which provides that "[t]he immunity of a foreign state . . . extends to . . . any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state."  Restatement § 66(f).

In *Samantar*, the Supreme Court expressed "no view on whether the Restatement § 66 correctly sets out the scope of the common-law immunity applicable to current or former foreign officials."  130 S. Ct. at 2290 n.15.  However, the Court did observe that "it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest."  *Id.* at 2292 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  The rule stated in Restatement

21

§ 66(f) is consistent with the principles underlying the common law of foreign sovereign immunity.  Allowing an American court to reach the merits of a suit against a public official for acts taken on behalf of the foreign state, and, thereby enforcing a rule of law against the foreign state, would certainly affect the "power and dignity" of that foreign state.  *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 144.  A state is *not* the "real party in interest" where a plaintiff names public officials as defendants and puts them on notice that they will be exposed to personal liability.  *Cf. Andrus ex rel. Adnrus v. Ark.*, 197 F.3d 953, 955 (8th Cir. 1999) ("In actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability.").  Conversely, the state is the "real party in interest" where the complaint simply names the official for purposes of pleading, but seeks relief in the form of monetary damages from the governmental entity.  *See Samantar*, 130 S. Ct. at 2292 (noting that the distinction between personal- and official-capacity suits did not present significant risk that "plaintiffs may use artful pleading to attempt to select between application of the FSIA or the common law" and observing that in the case before the Court, "respondents have sued petitioner in his personal capacity and *seek damages from his own pockets*") (emphasis added); *see also Graham*, 473 U.S. at 162–63, 166 (noting distinctions between the state and individual defendants as parties to a suit).

 As with Plaintiff's allegations against President Mills, it is not entirely clear what conduct by Ghana's Attorney General Plaintiff intends to rectify through this

suit.  But like his allegations against President Mills, Plaintiff apparently believes

that Ghana's Attorney General failed to pursue and prosecute those who

separated him from his money.  (*See* Compl. ¶¶ 68–69 (noting that former

President Kufuor informed the Attorney General of Ghana about Plaintiff's lack of

access to "currency assets"); *id.* ¶¶ 75–79 (asserting, *inter alia,* that Ghana's

Attorney General did not prosecute individuals who had harmed Plaintiff)).

Plaintiff's allegations against Ghana's Attorney General render the Republic of

Ghana the real party in interest here and show that Plaintiff seeks to hold the

Attorney General liable for acts performed in his official capacity.  Indeed, Plaintiff

states in his Complaint that references to Defendants throughout his Complaint

are to be construed as allegations concerning acts within the scope of

Defendants' official duties.  (Compl. ¶ 6.)  Chief among those duties is that

Ghana's Attorney General is "the principal legal adviser to the Government.  The

Attorney General is responsible for the institution, defense and conduct of all civil

cases on behalf of the State."  (Doc. No. 44, Solicitor General Decl. ¶ 4.)  And the

Attorney General "shall be responsible for the initiation and conduct of all

prosecutions of criminal offenses."  (Solicitor General Decl. ¶ 4, Ex. 1 (excerpt

from the Constitution of the Republic of Ghana).)  Plaintiff's concerns regarding

the discharge of those duties make this an official-capacity suit.

In addition, the effect of exercising jurisdiction in this matter would be "to

enforce a rule of law against" the Republic of Ghana.  *See* Restatement § 66(f).

At the core of the Attorney General's responsibilities as an agent of the Ghanaian

government is making decisions about how to pursue those accused of wrongdoing within Ghana's territory.  Were this Court to exercise jurisdiction, examine the merits of Plaintiff's claim that Ghana's Attorney General allowed some unsavory characters to get away with fraud, and conclude that the Attorney General's alleged failure to act subjected him to liability, we would certainly be enforcing some rule of law against the Republic of Ghana.  *See id.*  Imposing this Court's judgment about the propriety of the Attorney General's alleged failure to respond to Plaintiff's requests for assistance with a private commercial transaction gone wrong in Ghana would in no way respect the "necessarily exclusive and absolute" jurisdiction of the Ghanaian courts.  *See The Schooner Exchange*, 11 U.S. (7 Cranch) at 145; *cf. Heaney*, 445 F.2d at 503 (noting that among the "strictly political or public acts" for which foreign state immunity will be recognized are "'internal administrative acts'" (quoting *Victory Transp., Inc. v. Comisaria Gen.*, 336 F.2d 354, 360 (2d Cir. 1964))).  Thus, the reasons why this Court would not exercise jurisdiction over Plaintiff's claims against Ghana's President apply with equal force to Plaintiff's claims against its Attorney General. Accordingly, the Attorney General is immune from suit under the common law of foreign sovereign immunity, and this action should be dismissed against him for lack of subject matter jurisdiction.

### 4.   Ghana Commercial Bank

Defendants next argue that the Court should dismiss GCB from this suit as well because GCB's dismissal is required to give effect to the immunity enjoyed

by the Republic of Ghana under the FSIA.  (Defs.' Mem. 10–12.)  Relying again

on *Samantar*, Defendants contend that comity interests require this Court to

avoid interfering with Ghana's right to use its own courts to resolve the dispute

between Plaintiff and GCB.  (*See id.* at 11.)  In *Samantar*, the Court observed

that:

> [e]ven when a plaintiff names only a foreign official, it may be the
> case that the foreign state itself, its political subdivision, or an
> agency or instrumentality is a required party, because that party has
> "an interest relating to the subject of the action" and "disposing of the
> action in the person's absence may . . . as a practical matter impair
> or impede the person's ability to protect the interest.  If this is the
> case, and the entity is immune from suit under the FSIA, the district
> court may have to dismiss the suit, regardless of whether the official
> is immune or not under the common law.

130 S. Ct. at 2292 (citations omitted).

In support of this reasoning, the Supreme Court relied on *Republic of*

*Philippines v. Pimentel*, 128 S. Ct. 2180, 2191 (2008).  *Samantar*, 130 S. Ct. at

2292.  In *Pimentel*, the Court held that "where sovereign immunity is asserted,

and the claims of the sovereign are not frivolous, dismissal of the action must be

ordered where there is potential for injury to the interests of the absent

sovereign."   128 S. Ct. at 2191.  *Pimentel* was an interpleader action in which an

American brokerage company holding several million dollars in assets sought a

judicial determination concerning various parties' rights to those funds.  *Id.* at

2185–86.  Among the parties claiming to have a right to those funds were the

Republic of Philippines and a government Commission it had established to

attempt to recover funds believed to be wrongfully obtained by the Philippines

former head of state Ferdinand Marcos.  *Id.* at 2186.  The district court had

dismissed the Philippines and the Commission dismissed from the case under

the FSIA.  *Id.* at 2186.  But the Supreme Court explained that such "[a] case may

not go forward when a required-entity sovereign is not amenable to suit."  *Id.* at

2191.

The situation here is distinguishable from that in *Pimentel*.  In *Pimentel*, if

the case proceeded in the absence of the Philippines and the Commission, its

resolution would have impaired or impeded the sovereign's ability to protect its

claimed interest in the funds at issue and greatly risk prejudicing it.  *See id.*

at 2189–92 (analyzing Fed. R. Civ. P. 19(b)(1)).  Here, it is far from clear that the

Republic of Ghana has a similar interest in the outcome of this suit if the action

were to proceed against only GCB.  Defendants confirm as much in their

memorandum supporting their motion to dismiss.  They explain that the Republic

of Ghana "owns some shares in GCB," but it "is not liable for claims or damages

arising from the day-to-day business of GCB," and "had no involvement with

Plaintiff, directly or vis-à-vis GCB, or the alleged events that are the subject of the

Complaint."  (Defs.' Mem. 7–8 (citing Solicitor General Decl. ¶ 14).)  And the

Republic of Ghana also does not claim to have any interest in the $18 million in

defaced currency Plaintiff asserts he is entitled to recover through this suit.

Further, in *Pimentel* there was litigation ongoing in a Philippine court

concerning entitlement to funds being disputed in the American lawsuit;

therefore, an American court permitting the action to go forward without the

Philippines or the Commission would "bypass [the Philippines'] courts without right or good cause."  *Id.* at 2190.  Here, there is no ongoing litigation in Ghana concerning Plaintiff's allegations, so there is no pending case to bypass "without right or good cause.

   Although Defendants are likely correct that because all the events at issue allegedly took place in Ghana, Ghanaian courts may have an interest in resolving a lawsuit against a financial institution that operates within Ghana's borders (*see* Defs.' Mem. 11), this argument appears better suited to a *forum non conveniens* analysis than a comparison to *Pimentel*.

       Because *Pimentel* is not clearly applicable here, this Court concludes that the suit against GCB need not be dismissed to give full effect to the immunity granted to the Republic of Ghana, its President, and Attorney General. Therefore, Defendants' motions should be denied in this respect.

## B.   Lack of Personal Jurisdiction

       Although this Court does not recommend dismissal of this suit against GCB for lack of subject-matter jurisdiction, it does recommend dismissal for a different reason: Defendants correctly argue that this Court lacks personal jurisdiction over GCB.  (Defs.' Mem. 13–17.)[12]

---

[12]    Because this Court has already determined that it lacks subject matter jurisdiction over Plaintiff's suit against Ghana, its President, and Attorney General, it will not consider whether it has personal jurisdiction over these Defendants.

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff

'must state sufficient facts in the complaint to support a reasonable inference that

[the defendants] can be subjected to jurisdiction within the state.'" *Dever v.*

*Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (quoting *Block*

*Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)) (alterations in

*Dever*). "'A federal court in a diversity action may assume jurisdiction over

nonresident defendants only to the extent permitted by the long-arm statute of

the forum state and by the Due Process Clause.'" *Id.* at 1073 (quoting *Morris v.*

*Barkbuster, Inc.*, 923 F.2d 1277, 1280 (8th Cir. 1991)).[13] The Minnesota long-

arm statute permits exercise of jurisdiction to the same extent as the United

---

[13]    There is some question whether this Court has subject-matter jurisdiction over Plaintiff's claims against GCB based on diversity of citizenship or on the basis of a federal question. Plaintiff is a Minnesota citizen, GCB is a citizen of a foreign state, and the amount in controversy appears to exceed $75,000. *See* 28 U.S.C. § 1332. But Plaintiff also asserts claims under various federal statutes in his Complaint. "In federal question cases, the Due Process Clause of the Fifth Amendment—rather than the Due Process Clause of the Fourteenth Amendment—constrains the federal courts' exercise of personal jurisdiction over defendants." *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1012 n.7 (D. Minn. 2008) (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1389 n.2 (8th Cir. 1991)). It is not well settled in the Eighth Circuit whether a plaintiff must show that a defendant in a federal question case has minimum contacts with the forum state or with the United States as a whole. *See id.* (discussing the "mixed signals" governing this issue in the Eighth Circuit).

It is far from clear that federal-question jurisdiction even applies in this case since Plaintiff has merely referred to several federal statutes in his Complaint without linking them to the claims in the case. But even if this case involves a federal question, and Plaintiff would be required to show GCB's contacts with the United States as a whole for purposes of establishing personal jurisdiction, this Court would still find that Plaintiff has failed to make a *prima facie* showing of such contacts with the United States.

States Constitution, so this Court applies the federal standards. *Wessels, Arnold & Handerson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995); *Valspar v. Lukken Color Corp.*, 495 N.W. 408, 411 (Minn. 1992) (courts apply the federal standards to most personal-jurisdiction questions in Minnesota).

"'Due process requires 'minimum contacts' between [a] non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.''" *Dever*, 380 F.3d at 1073 (quoting *Burlington Indus.*, 97 F.3d at 1102 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980))). The defendant must have engaged in some conduct or have some connection with the forum state such that the defendant should reasonably anticipate being haled into court there. *World–Wide Volkswagen*, 444 U.S. at 297. In other words, the defendant must purposefully avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

There are two types of personal jurisdiction, general and specific. "When a cause of action arises out of or is related to a defendant's contacts with the forum state, the exercise of personal jurisdiction is one of specific jurisdiction." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003). "However, if the exercise of jurisdiction does not depend on the relationship between the cause of action and the defendant's contacts with the forum state, the exercise of personal

jurisdiction is one of general jurisdiction."  *Id.*  General jurisdiction exists when a defendant has "contacts with the state [that] are continuous and systematic."  *Id.*

Under either a general or specific personal-jurisdiction analysis, a court considers five factors to measure whether minimum contacts exist and whether the exercise of jurisdiction is reasonable: "(1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties."  *Dever*, 380 F.3d at 1073–74.  A court gives significant weight to the first three factors.  *See id.*

Taking the facts as pled by Plaintiff in the light most favorable to him, Plaintiff does not describe any contact or connection at all between GCB and the State of Minnesota.  All of the events alleged in the Complaint took place in Ghana.  The Complaint does nothing to describe what GCB may have done to purposefully avail itself of the privilege of conducting activities in Minnesota.  Nor does Plaintiff's Complaint allege there to be any relation between any purported contacts GCB may have with Minnesota and the Plaintiff's claims in this case. Therefore, this Court cannot exercise general or specific personal jurisdiction over GCB, and this Court recommends that the Complaint be dismissed against GCB on that basis.

C.    Defendants' Remaining Arguments

Because the Court lacks subject-matter jurisdiction over Plaintiff's case against the Republic of Ghana, Ghanaian President John Mills, and Ghana's Attorney General, and because the Court lacks personal jurisdiction over GCB, it need not consider Defendants' remaining arguments.  Therefore, this Court expresses no opinion whether this case should be dismissed under the acts-of-state doctrine, on grounds of *forum non conveniens*, on comity grounds, or because Plaintiff has failed to state a claim.  These may be alternative grounds for dismissal of the Complaint, but because it is not necessary to reach these issues to resolve this case, this Court will not consider them.

III.   PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND MOTION FOR SUMMARY JUDGMENT

Because this Court recommends that Defendants' motion to dismiss be granted, and this matter be dismissed in its entirety, Plaintiff's motion for default judgment and his motion for summary judgment are moot.  Also mooted by this Court's jurisdictional recommendations is Plaintiff's Motion [for] Leave to Amend a Clerical Error (Doc. No. 64), which suggests Plaintiff included a typographical error in Count 6 of his Complaint.  Therefore, this Court recommends that Plaintiff's motions be denied.

IV.   DEFENDANTS' REQUESTS FOR SANCTIONS

In their Motion to Dismiss and supporting Memorandum of Law, Defendants have asked this Court to issue an order for Plaintiff to show cause

why monetary sanctions should not be awarded in favor of the Defendants and against Plaintiff for filing a duplicative and frivolous lawsuit.  Specifically, Defendants seek reimbursement of their attorney's fees and costs.  (Doc. No. 41, Defs.' Mot. to Dismiss ("Defs.' Mot.") 2; Defs.' Mem. 26–29.)  Defendants have also asked this Court to issue an order enjoining Plaintiff from filing any future lawsuits against the Republic of Ghana, any of its officials, including but not limited to the President or Attorney General, and GCB without first obtaining leave of court.  (Defs.' Mot. 2; Defs.' Mem. 25–26.)

As noted above, *see supra* note 4, this is the third lawsuit featuring substantially similar allegations.  In the first, Plaintiff named both the Republic of Ghana and GCB as Defendants, and United States District Judge Donovan W. Frank dismissed the action without prejudice for lack of personal jurisdiction. *See Smith v. Ghana Commercial Bank*, Civ. No. 07-1447 (DWF/AJB), Doc. No. 34 at 4–8 (D. Minn. June 11, 2007).  In the second suit, Plaintiff again sued the Republic of Ghana and GCB, and United States District Judge Ann D. Montgomery dismissed that suit with prejudice on the grounds that Plaintiff failed to properly serve either party.  *Smith v. Ghana Commercial Bank, Ltd.*, Civ. No. 08-5324 (ADM/JJK), Doc. No. 63 at 11 (D. Minn. Oct. 13, 2009).

After Judge Montgomery dismissed the second suit, the Eighth Circuit Court of Appeals affirmed but remanded the case so that the dismissal could be entered "without prejudice."  *Smith v. Ghana Commercial Bank, Ltd.*, 379 F. App'x 542, 543 (8th Cir. June 14, 2010) (unpublished).  In its *per curiam* opinion,

however, the Eighth Circuit stated: "[b]ecause Smith has filed multiple meritless actions in the District of Minnesota raising similar claims, we remand to the district court to determine whether and, if so, the extent to which Smith should be precluded from filing additional claims in that court or in the United States." *Id.* Defendants assert that, following remand, "this Court dismissed the prior action without reaching this issue." (Defs.' Mem. 25.)  Quite the contrary, when the second case returned to this District on remand, Judge Montgomery explained that she considered the issue but declined to enter such an injunction at that time: "Having considered the issue, the Court concludes it is not necessary at this time to impose restrictions on [Plaintiff's] right to file claims." *Smith v. Ghana Commercial Bank, Ltd.*, Civ. No. 08-5324 (ADM/JJK), Doc. No. 74 at 1 (D. Minn. July 19, 2010).  Essentially, Defendants now argue that since Judge Montgomery's last Order declining to sanction Plaintiff, things have changed.

This Court notes that a *pro se* litigant has a right of access to the courts, but that right does not ensure an unrestricted opportunity to file frivolous, malicious, or abusive lawsuits.  *See In re Tyler*, 839 F.2d 1290, 1292 (8th Cir. 1988).  "Federal courts have a clear obligation to exercise their authority to protect litigants from such behavior."  *Id.*  A frivolous suit is one which has "no legal basis, often filed to harass or extort money from the defendant."  *Black's Law Dictionary* 1572 (9th ed. 2009).  When a litigant has frivolously litigated the same issues multiple times before, an injunction can be the appropriate remedy.  *See Zhang v. Equity Office Props. Tr.*, No. 06-2265 (MJD/AJB), 2007 WL 26324,

at *11 (D. Minn. Jan. 3, 2007) (citing *Sibley v. James*, Nos. 02-2047, 02-2022, 2002 WL 31159298, at *2 (8th Cir. Sept. 30, 2002)).   Although not binding, this Court finds instructive the Second Circuit's list of factors to consider in determining whether a litigation injunction is appropriate:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*See Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986), cited in *Dixon v. Deutsche Bank Nat'l Tr. Co.*, 360 F. App'x 703, 704 (8th Cir. Jan. 13, 2010) (unpublished).

However, the use of a pre-filing injunction "against a *pro se* plaintiff should be approached with particular caution and should remain very much the exception to the general rule of free access to the courts."  *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.2d 812, 818 (4th Cir. 2004) (quotations omitted).  "In limiting a citizen's ability to litigate, a court should take special care to ensure that the restrictions placed on the party are taken together, not so burdensome as to deny the litigant meaningful access to the courts."  *Niles v. Wilshire Inv. Group, LLC*, ___ F. Supp. 2d ___, 2012 WL 959378, at *7 (E.D.N.Y. Mar. 21, 2012) (quotations omitted).

As mentioned above, this is Plaintiff's third attempt to bring a lawsuit against the Republic of Ghana and GCB for the same conduct.  He has now added Ghanaian government officials to the suit, but the substance is the same.  Having to defend duplicative lawsuits imposes a burden on the parties who are forced to respond, and such suits impose an often unnecessary burden on the courts.  *See In re Martin-Trigona*, 573 F. Supp. 1237, 1242 (D. Conn. 1983) (noting that an obvious effect of excessive litigation is the unnecessary burden placed on court resources).

In this case, as in his previous two attempts to sue these parties, Plaintiff has not been represented by counsel, but has proceded *pro se.*  This fact cannot be taken against Plaintiff.  But Plaintiff's Complaint and other submissions in this case are prolix, poorly organized, and often difficult or impossible to comprehend, increasing the burden on the Court and the parties who are forced to respond to those filings.  Exacerbating matters is the fact that Plaintiff is not a poor communicator.  Rather, in his appearances before this Court in this and prior litigation, despite his lack of legal training, he has demonstrated an ability to understand and communicate effectively about legal principles.  His written filings, however, suggest that some harassing or misleading purpose may be motivating his litigation behavior.

Further, in the first suit, Judge Frank determined that the Court lacked personal jurisdiction over GCB.  Nothing has changed to alter Judge Frank's personal-jurisdiction analysis.  Plaintiff has not alleged any new or different

conduct that would subject GCB to personal jurisdiction in this District this time around.  Plaintiff's decision to sue GCB again in the same court for the same conduct suggests that he may not have a good faith expectation of prevailing against GCB.  *See Safir*, 792 F.2d at 24.  In this sense, his current lawsuit lacks any legal basis and appears to be frivolous.

Plaintiff has now had three attempts to draft his pleadings relating to the subject matter of this suit.  If the District Court adopts this Report and Recommendation, this will be the third time it has been dismissed.  Neither Defendants nor the Court should be subjected to the burden of a fourth suit involving these allegations.  Previous dismissals have not deterred Plaintiff from pursuing essentially the same litigation in this Court again.  For these reasons, this Court concludes that it is appropriate to place some restriction on Plaintiff's right to commence litigation against these Defendants and relating to this subject matter.

In tailoring any restriction, this Court is mindful that it should not impose a restriction so burdensome that it denies Plaintiff meaningful access to the courts. Although Plaintiff has unsuccessfully filed other lawsuits in this District that do not relate to the facts at issue in this case and prior related litigation, it does not appear that Plaintiff has so burdened the Court with extensive filings that it would be proper to prohibit him from all future filings without prior permission from the Court.  Rather, this Court recommends that Plaintiff be prohibited from filing any future lawsuits against the Republic of Ghana, any of its government officials,

36

and GCB, or any other party, relating to the subject matter of this suit without first obtaining leave of Court to do so.

Because this Court recommends that such a litigation injunction be imposed, it further recommends that no show cause order be issued under Rule 11 concerning the payment of attorney's fees and costs.  This Court imposes Rule 11 sanctions only where necessary to deter future litigation conduct that warrants the sanction.  Fed. R. Civ. P. 11(c)(4) (stating that a sanction under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated"); *Dunbar v. Wells Fargo Bank, N.A.*, Civ. No. 11-3683 (DSD/FLN), 2012 WL 1394666, at *2 (D. Minn. Apr. 23, 2012) (same).  Defendants seek the sanction of attorney's ees and costs based on *Intercontinental Res. N.A. v. The Fed. Republic of Nigeria*, No. 98 CIV.5114(TPG), 1999 WL 219909 (S.D.N.Y. Apr. 15, 1999), a case involving similar allegations to those in Plaintiff's Complaint here.  There, however, the district court granted a motion for attorney's fees and costs, but did not simultaneously impose a litigation injunction.  *Id.*, 1999 WL 219909, at *2–3. Moreover, in *Intercontinental Res.*, the district court specifically reached the merits of the plaintiff's claims, *id.*, which this Court has not done in this case and which no court has done in Plaintiff's previous two lawsuits.  Based on the foregoing, this Court concludes that the recommended litigation injunction should adequately deter Plaintiff and others similarly situated to him from engaging in sanctionable conduct, and, therefore, recommends denying Defendants' Motion

to Dismiss to the extent it seeks an order to show cause why Plaintiff should not be sanctioned further.

## REPORT AND RECOMMENDATION

Based upon the above, and upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Entry of Default and Default Judgment (Doc. No. 16), be **DENIED AS MOOT**;

2.      Plaintiff's Motion for Summary Judgment (Doc. No. 32), be **DENIED AS MOOT**;

3.      Plaintiff's Motion [for] Leave to Amend a Clerical Error (Doc. No. 64), be **DENIED AS MOOT**;

4.      Defendants' Motion to Dismiss (Doc. No. 41), be **GRANTED IN PART**  and **DENIED IN PART** as follows:

a.      The motion should be granted to the extent it seeks dismissal for lack of subject-matter jurisdiction on the claims against the Republic of Ghana, President John A. Mills, and Ghana's Attorney General;

b.      The motion should be granted to the extent it seeks dismissal for lack of personal jurisdiction on the claims against Ghana Commercial Bank;

c.      The motion should be granted to the extent it requests that Plaintiff be enjoined from filing any future case against the Republic of

Ghana, any of its government officials, and GCB relating to the subject

matter of this suit without first obtaining leave of court to do so; and

   d. The motion should be denied to the extent that it requests

Plaintiff be ordered to show cause why he should not be sanctioned

further; and

  5. This action be **DISMISSED WITHOUT PREJUDICE**.[14]


Date: June 18, 2012


         *s/ Jeffrey J. Keyes*
         JEFFREY J. KEYES
         United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 2, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

[14] This Court's recommendation for a dismissal without prejudice emphasizes that it has not reached the merits of Plaintiff's claims, but should not imply that he is somehow free to bring a suit against these Defendants or related to these allegation again in this District without prior leave of Court.  *Cf. Pope v. GmbH*, 588 F. Supp. 2d 1008, 1012 (D. Minn. 2008) (noting that dismissals for lack of personal jurisdiction and subject-matter jurisdiction are always without prejudice because the court lacks authority to render a judgment on the merits at all).